PEOPLE v YOUNG

Docket No. 44489. Submitted June 20, 1980, at Lansing.—Decided
    May 19, 1981. Leave to appeal applied for.
  Jeffrey A. Young was convicted of felony murder in Alpena
    Circuit Court and was sentenced, Philip J. Glennie, J. Defen-
    dant appeals, contending that the trial court erred by admit-
    ting expert testimony concerning the comparison, by use of the
    technique of electrophoresis, of bloodstains found at the scene
    of the crime to a sample of defendant's blood. He argues that
    the prosecutor's expert was not disinterested and impartial and
    that he failed to establish at trial that the electrophoresis
    technique had gained general acceptance in the scientific com-
    munity. Defendant's final contention is that the testimony of
    the expert witness was inadmissible because it merely included
    defendant in a class of possible defendants. *Held:*
      1. The rule which requires that a scientific technique must be
    accepted in the particular field in which it belongs and that
    such acceptance can be established only by testimony of disin-
    terested and impartial experts in that field before evidence
    obtained through the technique is admissible does not apply
    where there is no evidence offered to show that the technique is
    scientifically inaccurate or seriously disputed. The trial court
    did not err by admitting the testimony of the expert witness
    without first requiring that general scientific recognition of the
    electrophoresis technique be shown. The principal question in
    this case involved the use of the technique to compare bloods-
    tains found at the scene to known blood samples rather than
    the underlying acceptability of the electrophoresis technique
    itself. The question was properly one of opinion testimony
    within the competence and province of an expert witness and,
    although the testimony may have been presented by an inter-

REFERENCES FOR POINTS IN HEADNOTES
[1] 29 Am Jur 2d, Evidence §§ 818, 822.
    31 Am Jur 2d, Expert and Opinion Evidence § 19.
[2] 29 Am Jur 2d, Evidence §§ 106, 370.
    Admissibility, weight, and sufficiency of blood-grouping tests in
      criminal cases. 2 ALR4th 500.
    Blood grouping tests on issue of identity. 46 ALR2d 1025.

ested witness, the witness was clearly qualified in the fields of chemistry and blood analysis and the jury was entitled to hear his testimony and weigh its probative value.

2. The testimony of the expert witness was not inadmissible merely because it included defendant in a class of possible defendants. Admission of blood test analysis results which include a defendant in a class of possible defendants should be permitted in accordance with the rules for the admission of other physical evidence. The weight of such evidence is for the jury to determine.

Affirmed.

M. F. CAVANAGH, P.J., did not participate in the decision.

1. EVIDENCE — SCIENTIFIC TECHNIQUES.

The rule which requires that a scientific technique must be accepted in the particular field in which it belongs, and that such acceptance can be established only by testimony of disinterested and impartial experts in that field, before evidence obtained through the technique is admissible does not apply where there is no evidence offered to show that the technique is scientifically inaccurate or seriously disputed.

2. EVIDENCE — CRIMINAL LAW — BLOOD TEST.

Admission of blood test analysis results which include a defendant in a class of possible defendants should be permitted in accordance with the rules for the admission of other physical evidence.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Theodore O. Johnson,* Prosecuting Attorney (by *Leonard J. Malinowski,* Assistant Attorney General, Prosecuting Attorneys Appellate Service), for the people.

*Ronald J. Bretz,* Assistant State Appellate Defender, for defendant on appeal.

Before: M. F. CAVANAGH, P.J., and D. E. HOLBROOK, JR., and J. H. PIERCEY,* JJ.

J. H. PIERCEY, J. On December 7, 1978, defen-

---

* Circuit judge, sitting on the Court of Appeals by assignment.

dant was convicted by a jury of felony murder, MCL 750.316; MSA 28.548. The victim, Mitchell Lechtanski, was killed during a burglary of his home. Although there apparently were no eyewitnesses, the prosecution presented other evidence linking defendant directly to the crime. Defendant had told an investigating officer that he did not know the victim and had never been to his house, yet defendant's fingerprints were found at the scene of the crime. An analysis of defendant's blood revealed properties which corresponded positively to those of bloodstains found at the scene. One of defendant's friends testified that, on the day before the crime was committed, defendant told him that he planned to perpetrate a robbery on the north side of town. The witness further testified that on the same day that the offense was committed defendant told him that he had killed Lechtanski.

Defendant argues that the trial court committed reversible error when it admitted expert testimony concerning the comparison, by use of the technique of electrophoresis, of bloodstains found at the scene of the crime to a sample of defendant's blood. Defendant contends that the prosecutor's expert was not disinterested and impartial and that he failed to establish at trial that the technique he used had gained general acceptance in the scientific community.

Mark Stolorow, a forensic serologist working for the Michigan State Police, was the only expert witness to testify regarding the blood analysis performed by the use of electrophoresis. Stolorow testified that he had a master's degree in forensic chemistry, that he taught criminalistics at a college, and that he had been active in the research and development of electrophoresis as a technique for comparing blood samples.

Stolorow testified that electrophoresis is a method used for the biochemical analysis of enzymes and proteins in blood. A blood sample is placed into a gel and an electrical charge is applied. The electrical charge causes the enzymes and proteins to move into a pattern. A type of photograph is taken then. Information about the blood factors that the blood contains can be derived according to the patterns that form. The blood sample can then be classified into a particular population grouping according to the particular factors found therein. Stolorow testified that he had directed a research project involving 1,000 persons in the Detroit area for the purpose of determining the frequency that certain blood factors would be found in the general population. The results were checked internally for their statistical significance and were also compared to figures that had been established in other parts of the United States and around the world.

Stolorow testified that the technique of electrophoresis is simple and dates back many years in the field of biology. He further testified that only recently had the technique been adapted for use with very small samples of bloodstains, but that the techniques developed were, at the time of trial, employed routinely in case work. Stolorow stated that he had testified regarding the results of electrophoresis analysis in circuit courts in six Michigan counties and in Detroit Recorder's Court over the past several years. He further stated that electrophoresis is used in Red Cross clinics, in hospitals, at universities, in medical schools, and wherever studies in genetics are performed, as well as in crime laboratories, and that he personally knew of half a dozen people in Michigan, not associated with crime laboratories, who performed electrophoresis analysis on a routine basis.

Regarding the specific testing he performed in the present case, Stolorow testified that the blood factors that he was able to detect in a bloodstain found on the sidewalk outside the victim's home occurred in only 1.3 percent of the population and that the blood factors detected in a bloodstain found on the victim's porch occurred in only 1/2 of 1 percent of the general population. He further testified that the blood factors detected in the above bloodstains were also found to be present in the blood sample taken from defendant.

The initial question that must be addressed is what is the proper test to be applied in determining the admissibility of the scientific evidence presented here. In *People v Barbara,* 400 Mich 352, 357; 255 NW2d 171 (1977), the Michigan Supreme Court discussed the standard for admitting polygraph results, stating:

"The Michigan test presently applied to determine the admissibility of polygraph testimony is that which we enunciated in *People v Becker,* 300 Mich 562, 566; 2 NW2d 503 (1942), and repeated with approval in *People v Davis,* 343 Mich 348, 370; 72 NW2d 269 (1955), that there be:

" 'testimony offered which would indicate that there is at this time a *general scientific recognition* of such [polygraph] tests. Until it is established that reasonable certainty follows from such tests, it would be error to admit in evidence the result thereof.' " (Emphasis added.)

The *Barbara* Court further indicated, in accordance with *Frye v United States,* 54 US App DC 46; 293 F 1013 (1923), that the scientific technique used must be accepted in the particular field in which it belongs and that such acceptance can be established only by testimony of disinterested and impartial experts in the field.

The *Barbara* Court did not state that the *Davis/Frye* standard was applicable in determining the admissibility of scientific evidence other than polygraph results. In the subsequent case of *People v Tobey,* 401 Mich 141; 257 NW2d 537 (1977), the Supreme Court applied the *Davis/Frye* test in determining the admissibility of voiceprint comparison evidence.[1] Nonetheless, both *Tobey* and *Barbara* involved scientific devices the accuracy of which was hotly disputed. Thus, we do not view the *Tobey* case as extending the *Davis/Frye* rule to apply to all cases in which scientific evidence is sought to be admitted.

The applicability of the *Davis/Frye* test to the admission of scientific evidence other than polygraph results has been criticized in McCormick, Evidence (2d ed), § 203, p 491, as being too strict and preventing the admission of probative evidence which the jury should be given the opportunity to weigh in light of any opposing testimony.[2] The *Barbara* Court recognized this criticism at 379-380, and seemed to recognize that the strict *Davis/Frye* rule did not apply to scientific evidence in general. *Barbara, supra,* 380, 383, 404. Although the *Barbara* Court stated that it had applied the *Davis/Frye* rule in the past to the admission of scientific testimony where the jury was asked to determine the accuracy of scientific devices "in the face of a difference of scientific opinion as to their

[1] The *Davis/Frye* rule has also been applied in reviewing the admissibility of scientific evidence other than polygraph results in *People v Watkins,* 78 Mich App 89; 259 NW2d 381 (1977), *lv den* 406 Mich 954 (1979), which involved the admissibility of results of a microscopic comparison of hair samples, and in *People v Wesley,* 103 Mich App 240; 303 NW2d 194 (1981), which involved the admissibility of evidence of fingernail analysis and comparison.

[2] Application of the *Davis/Frye* rule to the admission of scientific evidence other than polygraph results was also criticized in 18 Wayne L Rev 1365, 1383-1398 (1972).

accuracy", see *People v Morse,* 325 Mich 270, 274; 38 NW2d 322 (1949), it also indicated that it had not applied the strict *Davis/Frye* rule in *People v Kenney,* 354 Mich 191, 196; 92 NW2d 335 (1958), "where evidence of a speedwatch was admitted *when defendant offered no evidence that the instrument was mechanically and scientifically inaccurate". Barbara, supra,* 365. (Emphasis added.) We conclude that because, in the present case, defendant offered no evidence that the electrophoresis technique used to compare the blood samples was scientifically inaccurate and because defendant has not convinced us that the accuracy of electrophoresis is seriously disputed the trial court did not abuse its discretion in admitting Mark Stolorow's testimony without first requiring that the *Davis/Frye* standard be met.

In the recently decided case of *People v Powell,* 97 Mich App 287; 294 NW2d 262 (1980), this Court was asked to determine whether error had been committed when the trial court permitted a radiologist to testify regarding his identification of a corpse after a comparison of chest X-rays was performed. Defendant objected that the prosecution had not shown that this was a scientifically accepted and reliable method of identification. The *Powell* Court distinguished *Tobey* and *Barbara* on the ground that those cases concerned an unproven or disputed scientific instrument and it accordingly held that the prosecutor was not required to demonstrate general scientific acceptability of the X-ray procedure. The Court concluded that the technique of identification by X-ray comparison was a question of opinion testimony typically within the competence and province of an expert witness and that the testimony presented by a qualified expert was properly placed before the

jury to be weighed by them as to its probative value.

The present case is similar to *Powell, supra,* in several respects. In *Powell,* there was no question that the use of X-ray equipment was establishd and accepted within the medical profession. In the present case, Mark Stolorow testified that electrophoresis was a simple technique that dated back many years in the field of biology and was employed widely in medical facilities and universities. The reasonable inference is that electrophoresis is a proven scientific technique. The present case is also similar to *Powell* in that there is no problem of deceptive efforts that might interfere with the accuracy of the scientific technique, as has been thought to be possible in the case of polygraph or voice print analysis.

In *Powell,* the principal issue was the employment of the X-ray technique for the purpose of identifying a corpse, as opposed to the underlying scientific acceptability of the X-ray procedure itself. Similarly here, the principal question involves the use of the electrophoresis technique to compare bloodstains found at the scene to known blood samples rather than the underlying acceptability of the electrophoresis technique itself. Therefore, the question was properly one of opinion testimony within the competence and province of an expert witness and, although the testimony in the present case was presented by an arguably interested witness, the witness was clearly qualified in the fields of chemistry and blood analysis and the jury was entitled to hear his testimony and weigh its probative value.

Defendant also argues that the testimony of the prosecution's expert witness was inadmissible because it merely included defendant in a class of

possible defendants. In *People v Sturdivant,* 91 Mich App 128, 134; 283 NW2d 669 (1979), this Court found that blood test evidence indicating that the complainant's attacker was a nonsecretor, that the attacker thus possessed a trait found in 20 percent of the general population and that the defendant was a nonsecretor was inadmissible. The Court held:

"We find that * * * blood type evidence, when used solely for the purpose of including a defendant in a class of possible defendants, has no probative value. Therefore, we hold that the trial court erred in admitting such evidence."

However, the Court distinguished the case of *People v Gillespie,* 24 Ill App 3d 567; 321 NE2d 398 (1974), wherein the test used limited the inclusive group to 2.7 percent of the relevant population, a much more specific group than that which was involved in *Sturdivant.* In *People v Horton,* 99 Mich App 40; 297 NW2d 857 (1980), *vacated on other grounds* 410 Mich 865 (1980), the Court went further and held that the admission of blood analysis results including a defendant in a class of possible defendants was not restricted by the size of the group but instead should be permitted in accordance with the rules for the admission of other physical evidence and that the weight of such evidence was for the jury to determine. We find no error.

Defendant's other claim of error is without merit.

Affirmed.

M. F. CAVANAGH, P.J., did not participate in the decision.